FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2007 SEP -6  A 9: 04

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549,

Plaintiff,

v.

Civ. Action No. 1:07cv895
LO/BRP

MICHAEL SAQUELLA,
a.k.a., MICHAEL PALOMA,
and LAWRENCE KAPLAN,

Defendants.

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

For its complaint against Michael Saquella, a.k.a., Michael Paloma ("Paloma"),

and Lawrence Kaplan ("Kaplan") (collectively, the "Defendants"), Plaintiff the United

States Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.  This matter concerns a scheme to violate the registration and antifraud

provisions of the federal securities laws.  Over the past four years, Michael Paloma has

orchestrated the unlawful public offerings of securities of at least seven companies and

the subsequent manipulation of the securities of those companies.  In 2002, in a separate

action, Paloma was fined and permanently enjoined in a federal district court action from

violating the registration and antifraud provisions of the federal securities laws.

2.  To facilitate this new scheme, Paloma surreptitiously gained control of all, or

nearly all of the shares of at least seven small, privately held companies by promising the

principals of those companies that he could provide them with hundreds of thousands of

dollars in funding. Relying on these disingenuous promises, the principals agreed to issue shares of their companies to entities that Paloma claimed were either accredited investors or underwriters necessary to facilitate the financing. In reality, these entities were merely straw men, controlled entirely by Paloma.

3. In each instance, once he gained control of the company's shares, Paloma arranged to unlawfully offer and sell the company's shares to the public via the Pink Sheets, an electronic quotation system. Thereafter, Paloma coordinated manipulative trading, including wash sales and matched orders, which artificially inflated the value of the stock of each company. This trading was carried out, in part, by Scottsdale, Arizona-based trader, Lawrence Kaplan. Paloma gave hundreds of thousands of shares of these companies' stock to Kaplan as compensation for his participation in the scheme.

4. With the artificial appearance of an active trading market established, Paloma coordinated promotional blast fax and spam e-mail campaigns that provided potential investors with often misleading information concerning each issuer's operations.

5. Ultimately, Paloma and Kaplan profited by dumping stock of the new issuers into the public market at the artificially inflated prices. After Paloma, Kaplan and other associates liquidated their holdings, they ceased trading and the market for the shares, lacking support, dropped precipitously.

6. These companies were left with tarnished reputations and only a tiny fraction of the financing promised by Paloma. In contrast, Paloma and his associates realized significant profits by retaining the vast majority of the proceeds of the offerings. Public investors who bought shares based upon the artificial appearance of an active market and the misleading promotional campaigns were left holding virtually worthless securities.

7.  Paloma's conduct violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a), § 77e(c) and § 77q(a)(1), and Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.  Kaplan's conduct violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## JURISDICTION AND VENUE

8.  The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(a), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), seeking to temporarily restrain, preliminarily enjoin, and permanently enjoin Defendants from engaging in the wrongful conduct alleged in this complaint.

9.  This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 77u(e) and 78aa.  Defendants directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

10.  Venue lies in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of Virginia.

## DEFENDANTS

11.  Michael Paloma, a.k.a., Michael Saquella, age 47, is a resident of Mesa, Arizona.  Paloma coordinated the fraudulent scheme that is the subject of this Complaint. Paloma controls a number of entities (collectively, "the Paloma-controlled entities") that either facilitated unlawful public offerings or received shares in the offerings.

12.  Lawrence Kaplan, age 63, is a resident of Scottsdale, Arizona.  Paloma gave Kaplan hundreds of thousands of shares of stock and directed him to place unsolicited bids, wash sales and matched orders in the securities of the issuers discussed herein.

## RELATED ENTITIES AND INDIVIDUALS

13.  Kenneth Christison, Esq., a member of the California bar, was responsible for drafting several legal opinion letters that made it possible for the Paloma-controlled entities to obtain shares of the defrauded issuers free of restrictive legends.

14.  Courtside Products, Inc. (Pink Sheets symbol CSDP) is a Spokane, Washington-based manufacturer of sports bags.  Defendants participated in the unlawful public offering and subsequent manipulation of the company's securities.

15.  Latin Heat Entertainment, Inc. (Pink Sheets symbol LHET) is a West Covina, California-based magazine publishing company.  Defendants participated in the unlawful public offering and subsequent manipulation of the company's securities.

16.  Xtreme Technologies, Inc. (Pink Sheets symbol XTMG) is a Spokane, Washington-based telecommunications consulting services firm.  Defendants participated in the unlawful public offering and subsequent manipulation of the company's securities.

17. PokerBook Gaming Corp. (Pink Sheets symbol POKG) is a Hollywood,
Florida-based online gaming business.  Defendants participated in the unlawful public
offering and subsequent manipulation of the company's securities.

18. Motion DNA Corp. (Pink Sheets symbol MTDX, formerly MOTD) is a
Scottsdale, Arizona-based provider of diagnostic testing.  Defendants participated in the
unlawful public offering and subsequent manipulation of the company's securities.

19. TKO Holdings, Ltd. (Pink Sheets symbol TKHL) is a Pompano Beach,
Florida-based manufacturer of fitness and boxing equipment.  Defendants participated in
the unlawful public offering and subsequent manipulation of the company's securities.

20. Commanche Properties, Inc. (Pink Sheets symbol CMCH) is a Tucson,
Arizona-based entertainment company.  Defendant Paloma participated in the unlawful
public offering and subsequent manipulation of the company's securities.

## GENERAL ALLEGATIONS

### Background

21. Michael Paloma was previously enjoined by the District Court for the District
of Columbia for conduct that occurred while he served as president and CEO of publicly-
traded Desert Winds Entertainment Corp. ("Desert Winds").   In March of 1999, Paloma
caused Desert Winds—an entity whose sole revenues were generated by a one time,
male-versus-female kickboxing event—to issue a press release announcing that it had
signed a contract with Warner Bros. Television worth $25 million in revenues.  In reality,
no such contract existed.  The fictitious contract was incorporated into Desert Winds'
financial statements as a $19.8 million receivable and reflected in the company's Form
10-12G which was filed with the Commission in 1999.  During this timeframe, Paloma

profited by selling Desert Winds stock in transactions that violated the registration requirements of Section 5 of the Securities Act.

22. In June 2002, the Commission filed a settled civil action against Paloma for his participation in the Desert Winds scheme. The Commission's complaint alleged that Paloma's conduct violated the antifraud provisions of the Securities Act and Exchange Act as well as the registration provisions of the Securities Act. Without admitting or denying the allegations, Paloma agreed to: (1) an injunction, barring him from future violations of these provisions, (2) pay $442,319 in disgorgement plus $27,070.64 in pre-judgment interest, (3) pay a civil penalty of $65,000, and (4) a permanent bar preventing Paloma from acting as an officer or director of a public company. *SEC v. Michael Paloma*, Civ. Action No. 1:02CV00645 (D.D.C. June 6, 2002). To date, Paloma has not paid any portion of this outstanding judgment.

<u>Paloma's Recent Scheme</u>

23. Less than two years after the entry of the injunction, Paloma commenced a new, highly profitable scheme, one that he repeated several times. In this new scheme, Paloma solicited small, privately held companies in need of financing. Passing himself off as a legitimate financier, Paloma claimed that he could raise significant funds for a company by conducting an offering of its securities. Typically, the principals of the companies he solicited were inexperienced in the field of public finance.

24. The standard agreement that Paloma entered into with a company provided that Paloma would arrange for the company's shares to be quoted on the Pink Sheets; thereafter, he would use his best efforts to facilitate the sale of up to $1 million of those shares to the public. Paloma concealed important facts, including his intent to conduct an

6

unlawful public distribution of the company's shares and then manipulate the market for those shares.

25. Sections 5(a) and 5(c) of the Securities Act prohibit the offer and sale to the public of any security unless a registration statement is in effect with regard to the security, absent an applicable exemption from registration [15 U.S.C. §§77e (a) & (c)]. No registration statement had been filed with the Commission or was in effect with regard to any public sale of the securities at issue, and no exemption, claimed by Defendants or otherwise, is applicable.

26. In conducting the offerings described herein, neither Paloma nor the companies complied with requirements of Rule 504 of Regulation D of the Securities Act, or any other provisions that exempt or except securities offerings from the registration requirements of the federal securities laws.

27. For Paloma's scheme to work, it was essential that he obtained a substantial block of the each company's purportedly free-trading shares, devoid of any restrictive legends. Legends on shares give potential third party purchasers and financial intermediaries notice that the shares are encumbered as to transferability in instances where the proposed transactions have not been registered pursuant to Section 5 of the Securities Act.

28. To facilitate this need, Paloma hired a lawyer to sign a boilerplate opinion letter stating that the shares could lawfully be issued without any restrictive legend, pursuant to Rule 504 of Regulation D of the Securities Act, and that there would be "no restriction on resale of the securities sold in the offering as proposed if the purchasers do, in fact, qualify as 'accredited investors.' "

7

29.  Paloma then provided the opinion letter to a transfer agent who, relying upon the lawyer's conclusion, physically issued the share certificates without any restrictive legend.  Thereafter, Paloma directed the companies to instruct the transfer agent to deliver the shares to various entities that Paloma claimed were either accredited investors or underwriters necessary to facilitate the sale of shares.  In reality, the entities receiving the shares were entities that Paloma created solely to serve as conduits for his fraud. Paloma concealed these facts from the companies.

30.  Paloma then arranged to obtain CUSIP numbers from Standard & Poor's and ticker symbols from the NASD, both predicates for the securities to be traded publicly.

31.  At this point in Paloma's scheme, even though the companies had no audited financials, and had published little, if any, information regarding their operations, products or services, Paloma had effectively prepared their shares to be quoted on the Pink Sheets and offered and sold unconditionally to the public.

32.  Next, Paloma transferred hundreds of thousands of shares of each company's stock, typically at no cost, to Lawrence Kaplan, a Scottsdale, Arizona-based resident.  At Paloma's direction, Kaplan contacted broker-dealers and placed limit orders to buy shares of the company's new stock at a set price unrelated to any market or demand for the security.  Shortly after this "unsolicited bid" was placed, using another brokerage account, Kaplan, Paloma, or another related individual placed an order to sell shares of the same stock.  These contemporaneous buy and sell orders represented the first public trades of the stock, and for all intents and purposes, the company became a publicly traded entity, albeit one that has obtained this status improperly.

8

33. Publishing unsolicited quotes allows a broker-dealer to meet an exception to Rule 15c2-11 of the Exchange Act, which requires a broker who wishes to quote a security to have in its possession current information, including financial information, about the issuer of the securities.

34. Thereafter, Paloma, Kaplan and/or others engaged in wash sales and matched orders, selling shares back and forth at artificial prices. This created the appearance of an active market. In no case was Kaplan purchasing securities based upon the issuer's potential or the intrinsic value of the issuer's stock.

35. In some instances, the account representative for both Kaplan and Paloma's accounts was Marshall Klein, a San Diego, California-based representative at broker-dealer World Trade Financial. On January 12, 2004, Klein, 45, pled guilty to one felony count of conspiracy to commit wire, mail and securities fraud based upon his involvement in a criminal conspiracy to impact artificially the demand and price of the publicly-traded securities of FoneCash, Inc. *U.S. v. Klein*, Case No. 03-CR-2654-JM (S.D. Cal.).

36. With the artificial appearance of an active market established, Paloma needed only to induce unsuspecting investors to buy the shares. To accomplish this, Paloma hired an investor relations firm to create a handful of press releases that purported to announce newsworthy events. Paloma then hired spammers to incorporate these press releases into millions of e-mail messages and blast faxes that included material misstatements and/or baseless price projections, and which typically failed to adequately disclose the nature and source of the spammer's compensation. These spam e-mails and blast faxes were often disseminated without the approval of the companies.

9

37.   Many of the spam e-mails were disseminated through Dulles, Virginia-based America Online.   Many of the recipients of the spam e-mails or blast faxes were Virginia residents, or were individuals who received these e-mails or faxes in Virginia.

38.   After the promotional campaign was underway and investors were attracted to the market, Paloma and his circle of associates dumped their shares.   Since these individuals initially acquired the shares at no cost, all sales, no matter the price, resulted in a profit to Paloma and his associates.   Once their positions were liquidated, these individuals ceased their wash sale and promotional activities.   Without this artificial stimulation, the share price collapsed.   The companies received only a miniscule portion of what Paloma originally promised in financing and were left with the burden of erasing the negative stigma associated with being the subject of a spam campaign.   Investors, many of whom are Virginia residents, were left with virtually worthless securities.

39.   Paloma has used this blueprint numerous times during the past three years, including in connection with the offerings of the securities of Courtside Products, Inc., Latin Heat Entertainment, Inc., Xtreme Technologies, Inc., PokerBook Gaming Corp., Commanche Properties, Inc., TKO Holdings Ltd. and Motion DNA Corp.

40.   As a result of his scheme, Paloma realized in excess of $2,155,034.   Only approximately 10% of these funds were given to the companies.   By dumping his shares at the artificially inflated prices, Lawrence Kaplan realized profits of $677,632.

<u>Courtside Products</u>

41.   Courtside Products, Inc. ("Courtside Products"), founded by Lola Emter ("Emter"), is a Spokane, Washington-based company that manufactures sports bags. During May 2004, after exhausting a $150,000 bank loan, privately held Courtside

10

Products actively sought capital to continue its operations.  Around that time, a consultant that Emter hired to help obtain financing for Courtside Products introduced her to Paloma.  Paloma told Emter he could guarantee $250,000 for Courtside Products by taking the company public.

42.  At Paloma's direction, on or about September 28, 2004, Emter instructed First American Stock Transfer, Inc. ("First American"), a Phoenix, Arizona-based transfer agent, to issue 18.75 million shares of Courtside Products stock to three entities which, unbeknownst to Emter, were controlled by Paloma.

43.  These shares were issued without a restrictive legend pursuant to a Rule 504 opinion of counsel letter signed by Kenneth Christison.  Christison received cash and 50,000 shares of Courtside Products stock from Paloma for authoring this opinion.  With these issuances, Paloma controlled all but 50,000 of the purportedly free-trading shares of Courtside Products.

44.  On or about September 28, 2004, Paloma transferred 200,000 shares of Courtside Products stock to Lawrence Kaplan.  In return, on or about October 7, 2004, Kaplan, through a nominee account, became the first public buyer of Courtside Products shares when he placed an unsolicited bid to purchase 200 shares of Courtside Products at $.48 per share.  Later that day, Paloma entered orders to buy a total of 1,000 shares of Courtside Products stock at $.48 per share, and sell a total of 5,200 shares at $.45 per share through a different account.  These transactions created the artificial appearance of legitimate trading activity in the company's securities.

45. On October 12, 2004, Paloma sold 32,000 shares of Courtside Products stock through a nominee account at $.60 per share while simultaneously purchasing 32,000 shares in yet a different nominee account at $.56 per share.

46. In early October 2004, Paloma referred Emter to an investor relations firm to assist her in the creation of a number of press releases. On October 22, 2004, this investor relations firm issued a press release on behalf of Courtside Products.

47. Beginning on or around October 23, 2004, and continuing through January 2005, Paloma coordinated the dissemination of spam e-mails and blast faxes touting shares of Courtside Products.

48. Some of the spam e-mails and blast faxes stated that "Courtside Products (CSDP) is a prime TAKEOVER target for Nike and Reebok!" Others provided a "Strong Buy Rating" for the company with a projected target price of $4.50 per share. Subsequent spams provided a "Strong Buy" recommendation for the issuer, and instructed investors to look for a "Possible **strategic** Alliance" as well as "Increased Exposure from media outlets including television networks," and expansion plans that "call for 30% to 35% increase in sales in 2005." Defendants knew, or were reckless in not knowing, that these statements were material and were misleading and/or false.

49. None of the spam e-mails or blast faxes disclosed the fact that Paloma, a securities recidivist who controlled the shares of the company, had paid for the dissemination of these materials. Defendants knew, or were reckless in not knowing, that these omissions were material and were misleading and/or false.

50. Between October 7, 2004 and January 21, 2005, during the timeframe of the spam e-mail and blast fax campaigns, Paloma sold at least 1,880,065 shares of Courtside

Products, realizing proceeds of approximately $274,900.  Despite being guaranteed at least $250,000 from Paloma, Courtside Products received only $75,000.

51.  On January 28, 2005, the Commission suspended trading in shares of the company based upon questions concerning the company's reliance on Rule 504 of Regulation D of the Securities Act in conducting a distribution of its securities which failed to comply with the resale restrictions of Regulation D.  *In the Matter of Courtside Products, Inc.*, Release No. 34-51087 (order of suspension of trading entered January 28, 2005).

### Latin Heat Entertainment

52.  Latin Heat Entertainment, Inc. ("Latin Heat"), founded in 1992 by Belarmina "Bel" Hernandez ("Hernandez"), is a West Covina, California-based operation that publishes an online newsletter and hardcopy magazine reporting on Latino entertainers in the television, music and film industries.

53.  After exhausting a $50,000 loan and maxing out her personal credit cards to fund Latin Heat's operations, Hernandez was introduced to Paloma by an acquaintance. On April 1, 2004, Paloma told Hernandez that he could raise $2 million for Latin Heat by conducting an offering of its shares.  Paloma further indicated that he could raise the first $350,000 within two weeks through a stock promotional campaign.  Paloma purportedly told Hernandez that he would waive his $50,000 fee in exchange for free advertising in upcoming Latin Heat publications.

54.  At Paloma's direction, in early May 2004, Hernandez instructed First American to issue 12.75 million shares of Latin Heat stock to two entities which, unbeknownst to Hernandez, were controlled by Paloma.  These shares were issued

13

without a restrictive legend pursuant to a Rule 504 opinion of counsel letter signed by Kenneth Christison. With these issuances, Paloma controlled all, or nearly all of the purportedly free-trading shares of Latin Heat.

55. On May 6, 2004, Paloma transferred 300,000 shares of Latin Heat at no cost to Kaplan. In return, on or about June 1, 2004, Kaplan became the first public buyer of shares of Latin Heat when he placed an unsolicited order to buy 5,000 shares of the company's stock at $.65 per share. Kaplan then used a separate brokerage account at a different firm to complete the first ever public trade of Latin Heat's securities when he placed an "offer" to sell 5,000 shares of Latin Heat at the same price. This represented the only transaction in Latin Heat's securities on that day.

56. During the first week of trading, over 40,000 shares of Latin Heat stock were exchanged, almost all of which were purchased by individuals associated with Paloma. Kaplan, who represented 100% of the selling activity during this period, placed bids in multiple accounts at Paloma's instruction in order to establish a market. This activity created the artificial appearance of a genuine market for Latin Heat's securities.

57. During the first week of May 2004, Paloma directed Hernandez to draft at least one press release and send it to an investor relations firm for review. With this firm's assistance, on June 7, 2004, Latin Heat issued a press release announcing that, due to the newsletter's expanded print run, the company had "initiated discussions with the largest publisher in Latin America for possible alliance." Defendants knew, or were reckless in not knowing, that this statement was material and was misleading and/or false.

58. On or about June 14, 2004, Paloma coordinated the dissemination of a spam e-mail entitled "New Hot Stock Pick!!!!: Hispanic Market BOOMS". The spam

described Latin Heat as "one of the most amazing opportunities ever," and projected a short term target price for Latin Heat of $2.40 per share and a "short term gain" of 300%. Defendants knew, or were reckless in not knowing, that these projections were without support and were material and were misleading and/or false.

59.  Days later, Latin Heat was the subject of another Paloma-orchestrated blast fax and spam e-mail campaign.  One version of the spam projected a 10-day target price of $2.87 per share, a 3-month target price of $4.43 per share, and predicted that Latin Heat was "set to explode on Monday June 21st," the date of the company's second press release.  Defendants knew, or were reckless in not knowing, that these projections were without support and were material and were misleading and/or false.

60.  None of these spam e-mails or blast faxes disclosed that the source of these promotional materials had been compensated by Paloma or entities affiliated with Paloma.  Those with disclaimers stated only that the "parties involved in the creation and distribution of this profile" had been compensated $40,000 by a nonaffiliated third party for their services.  In no case was Paloma's involvement disclosed.  Defendants knew, or were reckless in not knowing, that these omissions were material and were misleading and/or false.

61.  Between June 1 and June 18, 2004, shares of Latin Heat traded consistently in the range of $.65 to $.77 per share on an average daily trading volume of 12,053 shares. On June 21, 2004—the precise day that the spam e-mails and blast-faxes claimed that Latin Heat was "set to explode"—shares of the company's stock plummeted to $.23 per share on volume of 1,737,934 shares, representing more than 140 times the average daily trading volume experienced by Latin Heat during its first two weeks of trading.

62. On June 21 and June 22 alone, the Paloma-controlled entities sold a total of over 268,000 shares at prices ranging from $.18 to $.66 per share, realizing proceeds of over $60,000. In total, Paloma realized $91,736. Kaplan realized total proceeds of $205,886.

63. Hernandez, who had been promised $2 million by Paloma, received only $20,000. Latin Heat has since declared bankruptcy.

Xtreme Technologies

64. Xtreme Technologies, Inc. ("Xtreme Technologies"), founded in 1998 by Michael Burk ("Burk"), is a Spokane, Washington-based telecommunications consulting service. After exhausting a series of loans, on or about August 16, 2004, Burk signed a contract with Paloma providing that his company would receive a minimum of $250,000 as a result of a public offering. Paloma agreed to use his best efforts to sell further shares with additional proceeds of up to $750,000 going to the company. In exchange for these services, Paloma would receive 2.5% of the company's shares.

65. At Paloma's direction, during September 2004, Burk instructed First American to issue 18.75 million shares of Xtreme Technologies stock to three entities which, unbeknownst to Burk, were controlled by Paloma. These shares were issued without a restrictive legend pursuant to a Rule 504 opinion of counsel letter signed by Kenneth Christison. With these issuances, Paloma controlled all, or nearly all of the purportedly free-trading shares of Xtreme Technologies.

66. During September 2004, Paloma transferred 200,000 shares of the company's stock to Kaplan. In return, on or about September 23, 2004, the first public trade in Xtreme Technologies stock occurred on the Pink Sheets after Kaplan placed an

16

unsolicited bid to buy 1,000 shares at $.82 per share. Through another account, Kaplan sold a total of 1,600 shares at $.80 per share. In an apparent attempt to support the price, Kaplan, through another nominee account, placed a second "bid" to purchase an additional 100 shares at $.80 per share. These transactions comprised all of the activity on the first day of trading.

67. Beginning on or about September 24, 2004, and continuing through the end of October 2004, Paloma coordinated the dissemination of spam e-mails and blast faxes, some stating that "it is widely believed amongst market experts that XTMG has been one of Wall Street's best kept secrets...and many are positioning themselves to take advantage of the extraordinarily significant gains that will result from their Initial Public Offering on Monday, September 27th." Others provided "*Strong buy*" recommendations for the company's stock and a six-month price projection of $5.40 per share. Defendants knew, or were reckless in not knowing, that these baseless projections were material and were misleading and/or false.

68. A statement at the bottom of the September blast faxes disclosed that the *Emerging Equity Alert* held "shares of XTMG prior to the publication of this report." The disclaimer did not disclose the source of those shares as Paloma. Defendants knew, or were reckless in not knowing, that these omissions were material and were misleading and/or false.

69. Between September 24 and November 4, 2004, during the timeframe of the spam e-mail and blast fax campaigns, Paloma sold at least 9,100,000 shares of Xtreme Technologies stock, realizing proceeds of $775,926. During that same time period, Kaplan sold an additional 200,000 shares realizing proceeds of $104,861.

70. Despite being guaranteed at least $250,000 by Paloma, Xtreme Technologies received only $150,000.

## PokerBook Gaming

71. PokerBook Gaming Corp. ("PokerBook Gaming"), founded in 2003 by Jack E. Owens ("Owens"), is a Hollywood, Florida-based online poker business. Since the company's inception, Owens, as president of PokerBook Gaming, had unsuccessfully sought financing for his fledgling business. In February 2004, Paloma promised to raise $1 million for PokerBook Gaming by taking the company public through a "Texas 504 offering."

72. At Paloma's direction, during early May 2004, Owens instructed First American to issue 10 million shares of PokerBook Gaming stock to two entities, which, unbeknownst to Owens, were controlled by Paloma. These shares were issued without restrictive legends pursuant to a Rule 504 opinion of counsel letter. With the issuance, Paloma controlled all, or nearly all of the company's purportedly free-trading shares.

73. During June 2004, Paloma transferred 200,000 shares of the company's stock to Kaplan at no cost. In return, on or about July 12, 2004, Kaplan placed an unsolicited bid to purchase 5,000 shares at $.30 per share. In order to create the artificial appearance of legitimate trading in the company's securities, Paloma countered the bid by selling 5,000 shares to Kaplan at the same price.

74. Beginning on or about July 22, 2004, and continuing through the end of October 2004, Paloma coordinated the dissemination of spam e-mails and blast faxes, some stating that it was "very possible for POKG to surpass revenues in excess of $389 million per year." None of these spam e-mails or blast faxes disclosed that the source of

18

these promotional materials had been compensated by Paloma or entities affiliated with Paloma. Defendants knew, or were reckless in not knowing, that these statements and omissions were material and were misleading and/or false.

75. Between July 20 and August 20, 2004, during the timeframe of the spam e-mail and blast fax campaigns, Paloma sold at least 1,237,122 shares of PokerBook Gaming stock, realizing proceeds of approximately $175,664. During that same time period, Kaplan sold an additional 200,000 shares, realizing proceeds of $66,623.

76. Despite being guaranteed at least $1 million from Paloma, PokerBook Gaming received only $27,000.

Motion DNA

77. Motion DNA Corp. ("Motion DNA") is a Scottsdale, Arizona-based provider of diagnostic testing for medical professionals and sports organizations. On information and belief, Paloma convinced the principals of Motion DNA to cause shares of the company to be transferred to Paloma-controlled entities based on the promise that Paloma would generate financing through a public offering.

78. On January 27, 2004, ten million shares of Motion DNA were issued by First American to two Paloma-controlled entities. These shares were issued by the transfer agent, without a restrictive legend, pursuant to a boilerplate Rule 504 opinion letter. On or about January 27, 2004, Paloma transferred 300,000 shares of the company's securities to Kaplan. On or about January 30, 2004, Paloma sold 150,000 additional shares to Kaplan at $.01 per share.

79. On January 30, 2004, Motion DNA began trading publicly after an unsolicited order to buy 500 shares at $.77 per share was placed through Research Capital

19

Corp. ("Research Capital"), a brokerage firm located in Toronto, Canada. Shortly thereafter, Boca Raton, Florida-based Secure Trading Group, Inc. ("STG") sold 500 shares at $.75 per share. STG then sold another 500 shares at $1.00 per share. Thereafter, the account at Research Capital purchased another 500 shares at $.75 per share. The shares traded through Research Capital and STG were received from Paloma-controlled entities.

80. Later that afternoon, a Paloma-controlled entity sold 150,000 shares of Motion DNA at $.01 per share. Contemporaneously, Kaplan purchased 150,000 shares of Motion DNA, also at $.01 per share. Near the close of trading on January 30, 2004, Kaplan sold an additional 1,000 shares, which were purchased by a Paloma-controlled account at $.75 per share. This practice, known as "marking the close," reflected a high closing price for the security and was not an accurate representation of the overall market demand for the security. Paloma and Kaplan represented 98% of trading in Motion DNA on this day.

81. Beginning on or about January 31, 2004, and continuing through the end of February 2004, Paloma coordinated the dissemination of spam e-mails and blast faxes, some projecting future revenues in excess of $6.76 million in 2004, $12.22 million in 2005, and $18.38 million in 2006. Other spam e-mails claimed that Motion DNA's clients included, among others, Tiger Woods, Titleist, Calloway [sic] Golf, the Oakland Athletics, the Chicago Cubs, the Arizona Diamondbacks and the San Francisco Giants. The spams provided a 10-day target price of $2.04 per share and a 3-month target price of $3.92 per share for the company's stock. Defendants knew, or were reckless in not knowing, that these statements were material and were misleading and/or false. None of

these spam e-mails or blast faxes disclosed that the source of these promotional materials had been compensated by Paloma or entities affiliated with Paloma. Defendants knew, or were reckless in not knowing, that these omissions were material and were misleading and/or false.

82. Many of these spam e-mails and blast faxes were disseminated by Dallas, Texas-based BMA Ventures. On March 9, 2006, the Commission filed a lawsuit against BMA Ventures, and its president, William Robert Kepler, alleging that the company had obtained approximately $2 million in a fraudulent scalping scheme during 2004 and 2005. *SEC v. BMA Ventures, Inc., et al.*, Civ. Action No. 06-3-06CV0427-P (N.D. Tex., filed March 9, 2006).

83. Between January 30 and May 13, 2004, during the timeframe of the spam e-mail and blast fax campaigns, Paloma sold at least 1,775,000 shares of Motion DNA stock, realizing proceeds of $473,499. During the same period, Kaplan sold an additional 200,000 shares realizing proceeds of $235,710.

### TKO Holdings

84. TKO Holdings Ltd. ("TKO Holdings") is a Pompano Beach, Florida-based manufacturer of fitness and boxing equipment. On information and belief, Paloma persuaded the principals of TKO Holdings to cause the company's shares to be issued to Paloma-controlled entities in exchange for promised financing from a public offering.

85. On or about March 26, 2004, First American issued 8 million shares of TKO Holdings to a Paloma-controlled entity. First American issued these shares without a restrictive legend on the basis of a boilerplate Rule 504 opinion letter. The same Paloma-

21

controlled entity subsequently transferred 100,000 shares to Kaplan, and an additional 2 million shares to STG, the same firm that made the initial purchases of Motion DNA.

86.   On March 26, 2004, TKO Holdings traded publicly for the first time. Just before the close of trading that day, Research Capital placed two orders to buy 500 shares of TKO Holdings at $.60 per share. STG, using shares received from Paloma, sold 1,000 shares of TKO Holdings at $.60 per share.

87.   Beginning on or about March 27, 2004, Paloma coordinated the dissemination of spam e-mails, some stating that TKO Holdings had "done over $15 million in revenues in 2003," and recommending that "these shares should be bought, as it is very predictable which direction a stock with strong, growing revenues is going to go." Defendants knew, or were reckless in not knowing, that these statements and projections were material and were misleading and/or false. None of these spam e-mails disclosed that the source of these promotional materials had been compensated by Paloma or entities affiliated with Paloma. Defendants knew, or were reckless in not knowing, that these omissions were material and were misleading and/or false.

88.   Between March 29 and May 6, 2004, during the timeframe of the spam e-mail and blast fax campaigns, Paloma sold at least 750,000 shares of TKO Holdings stock, realizing proceeds of $363,309. During the same period, Lawrence Kaplan sold an additional 100,000 shares, realizing proceeds of $64,552.

<u>Commanche Properties</u>

89.   Commanche Properties, Inc. ("Commanche Properties"), founded in 2004 by Anthony Tarantola and Bill Bonanno, was a Tucson, Arizona-based entertainment company. On information and belief, Paloma obtained control of shares of Commanche

Properties on the promise that he would raise money for the company through a public offering.

90.    On November 12, 2004, First American issued ten million shares of Commanche Properties to two Paloma-controlled entities. First American issued these shares without a restrictive legend, pursuant to a boilerplate Rule 504 opinion letter authored by Kenneth Christison.

91.    Beginning on or around January 22, 2005, Paloma coordinated the dissemination of spam e-mails, some advertising Commanche Properties as a "multi-million dollar producer of commercially marketable and high quality entertainment products that provides short term return on capital and long term residual income for partners and investors." None of these spam e-mails disclosed that the source of these promotional materials had been compensated by Paloma or entities affiliated with Paloma. Defendants knew, or were reckless in not knowing, that these statements and omissions were material and were misleading and/or false.

92.    On January 24, 2005, the first public trade in this company occurred on the Pink Sheets after a Paloma-controlled entity placed an unsolicited bid to buy 1,000 shares at $.90 per share. Between January 24 and January 31, Commanche Properties traded on four days with total volume of less than 4,000 shares.

93.    On January 31, 2005, the Commission suspended trading in shares of Commanche Properties based upon questions concerning the company's reliance on Rule 504 of Regulation D of the Securities Act in conducting a distribution of its securities which failed to comply with the resale restrictions of Regulation D. *In the Matter of Commanche Properties, Inc.*, Release No. 34-51105 (order of suspension of trading

23

entered January 31, 2005). Trading in Commanche Properties never resumed after the Commission's 10-day trading suspension.

## FIRST CLAIM FOR RELIEF

### Defendant Paloma Violated Sections 5(a) and 5(c) of the Securities Act

94.   Paragraphs 1 through 93 are realleged and incorporated by reference.

95.   As set forth above, Paloma, directly or indirectly, by use of the means or instrumentalities of interstate commerce or by use of the mails and of the facilities of a national securities exchange, knowingly or recklessly sold or carried unregistered securities, or caused unregistered securities to be sold or carried.

96.   By reason of the foregoing, Paloma violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e (a) & (c)].

## SECOND CLAIM FOR RELIEF

### Defendants Paloma and Kaplan Violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

97.   Paragraphs 1 through 96 are realleged and incorporated by reference.

98.   In connection with the offer and sale of the securities of the seven issuers described herein, Paloma and Kaplan made misrepresentations and omissions to issuers, investors and prospective investors regarding material facts, and engaged in other deceptive conduct designed to make the market for each issuer's securities appear enticing to investors and prospective investors.

99.   By their conduct, described above, Paloma and Kaplan directly and indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instruments of transportation or communication in, interstate commerce, or by the use of the mails, in the offer or sale, and in connection with the purchase or sale, of securities:

24

(a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made untrue statements of material fact, or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, acts, practices, and courses of business that operated or would operate as a fraud or deceit upon purchasers of securities or other persons.

100. By reason of the foregoing, Paloma and Kaplan violated Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, § 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

101. Paloma and Kaplan will, unless restrained and enjoined, continue to engage in the transactions, acts, practices and courses of business alleged in this Complaint, or in similar transactions, acts, practices and courses of business, in violation of the federal securities laws.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a judgment:

A.     Permanently enjoining Paloma and Kaplan, and their agents, servants, employees, representatives, attorneys, affiliates and all persons in active concert or participation with them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. §77q(a)(1), and Section 10(b) of the Exchange Act, 15 U.S.C.§ 78j(b), and Rule 10b-5, 17 C.F.R.§ 240.10b-5, thereunder;

B.     Permanently enjoining Paloma and his agents, servants, employees, representatives, attorneys, affiliates and all persons in active concert or participation with

25

him, from future violations of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77(e)(a) and (c);

C.       Ordering Paloma and Kaplan to disgorge with prejudgment interest all monies obtained through the illegal activities described above;

D.       Barring Paloma and Kaplan from participating in an offering of a penny stock, pursuant to Section 21(d)(6) of the Exchange Act, 15 U.S.C.§ 78(u)(d)(6);

E.       Granting the Commission such further relief as this Court deems just and appropriate.

Dated: September 6, 2007

By:       _Erica M. Williams_

Erica Williams (Virginia Bar No. 43303)
John Reed Stark
Thomas A. Sporkin
David R. Herman
Michael J. Juliano
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-4010
(202) 551-4450 (Williams)
(202) 551-4892 (Stark)
williamse@sec.gov